IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 4, 2013

## STATE OF TENNESSEE v. CALVIN PERSON
AND MAURICO GRANDBERRY

**Appeal from the Criminal Court of Shelby County**
**No. 10-01780   James C. Beasley, Jr., Judge**

───────────────────

**No. W2011-02682-CCA-R3-CD  - Filed October 31, 2013**

───────────────────

Calvin Person ("Defendant Person") and Maurico Grandberry ("Defendant Grandberry") (collectively "the Defendants") were convicted by a jury of first degree felony murder. The trial court sentenced the Defendants to life imprisonment. On appeal, Defendant Grandberry asserts that the trial court erred in not severing the Defendants. Defendant Person argues that the trial court erred in: excluding evidence of Defendant Grandberry's involvement in a separate robbery on the day the victim in this case was killed; admitting Defendant Person's statement to police; including the natural and probable consequences rule in its jury instruction on felony murder; and denying Defendant Person's request to provide a special jury instruction on the requisite mens rea necessary for criminal responsibility. Additionally, both of the Defendants contend that the evidence presented at trial was insufficient to support their convictions. After a thorough review of the record and the applicable law, we affirm the Defendants' convictions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments**
**of the Criminal Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and JAMES CURWOOD WITT, JR., JJ., joined.

Joseph A. McClusky (on appeal) and Michael Working (at trial), Memphis, Tennessee, for the appellant, Maurico Grandberry; and Lauren Pasley-Ward, Memphis, Tennessee, for the appellant, Calvin Person.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Reginald Henderson and Kate Edmands, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

A Shelby County Grand Jury indicted the Defendants on one count each of first degree felony murder. The Defendants proceeded to a jury trial held October 24-29, 2011.

LaShawn Blades testified that she lived in a duplex next to the duplex occupied by Free Baptist Strickland ("the victim"). She knew Defendant Person because she was dating Defendant Person's cousin, Tyrone, at the time of the incident. She also knew Defendant Grandberry, whom she referred to as "Tutu." She stated that she spent time with all of these individuals because they all lived in the same neighborhood. According to Blades, the victim sold powder cocaine as his source of livelihood.

Approximately one week before the victim died, Blades was in her house and overheard the Defendants on the porch. She testified, "Tutu said that he wanted to kill Free. And his words was, man, I'm going to kill that bitch. And [Defendant Person] says, no, man. We just going to rob that n****r, you know. I'm just saying how, you know. And Tutu like, man, no." Soon after, Defendant Grandberry left, and the victim drove up. Blades told the victim what Defendant Grandberry had said, and he responded, "[C]uz, I'm going to be all right, you know."

Defendant Grandberry then returned to Blades' residence, "ran up and hit [her] door," and said, "Bitch, you next." Blades stated, "I knew he meant that because [he] knew that I had told [the victim] what he said."

On cross-examination, Blades acknowledged that Defendant Grandberry's father, Gabriel King, and the victim were close friends. She was not at home at the time that the victim was killed. After she heard that the victim had died, she jumped the fence into her backyard to return to their street.

Blades also acknowledged that she used drugs but denied using powder cocaine or receiving drugs from the victim. She explained that the victim actually was killed at a vacant home on the other side of the victim's house from Blades' residence.

She learned about the victim's death from a man named Mr. LeMont, who had called her to find out what was going on. When she arrived home, many people from the neighborhood were outside, as well as police officers. The next day, Blades called the police and reported that she thought she knew who killed the victim. Later that day, the police picked her up and took her to the homicide office. They also brought her to the office a

second time two days later, and it was not until this occasion that she gave a formal statement. She identified pictures of both Defendants as well as another individual, Falantis. Next to Falantis' picture was her written description, "This is Falantis. I know him from being with [Defendant Grandberry]. Officer Wells arrested him yesterday." She agreed that Falantis was from the same neighborhood and that she had seen him with Defendant Grandberry regularly. According to Blades, she told police that Defendant Grandberry had killed the victim and that Defendant Person had robbed him, based on their discussion she had overheard on her porch. She heard Defendant Grandberry say the same thing seven times over the course of five days. She reiterated that every time Defendant Grandberry said that he wanted to kill the victim, Defendant Person would say, "[N]o, man, we're going to rob him."

Blades acknowledged that, in her statement on April 28, 2009, she told police, "I know in my heart that [Defendant Grandberry] and Falantis killed [the victim]." She explained that she had believed Falantis was involved based on what she had heard from other people. But in her original discussion with police on April 26, 2009, she had not yet heard about Falantis and, accordingly, did not tell police that he was involved.

Blades also acknowledged that she was convicted of forgery in 2004. On redirect examination, she stated that Falantis was never with the Defendants when they discussed robbing and killing the victim.

Officer Lamarcus Webb with the Memphis Police Department ("MPD") testified that he was on patrol on April 25, 2009. He responded to the scene after receiving a call over the radio regarding a shooting. He and his partner were the first law enforcement officers to arrive, and, soon after their arrival, they found the victim in the backyard of a residence. The victim appeared to be dead when they first saw him. Officer Webb noticed that the victim "was pretty bloody" and that the victim's "pockets were turned inside out."

Bessie Beal, another neighbor of the victim, testified that she had known the victim approximately one year. She grew up with Defendant Person and knew Defendant Grandberry through her son. On the day that the victim died, he had been at her home at approximately 8:30 p.m. She also had seen the Defendants earlier that day.

While the victim was at her home, he received a call from an individual named "Dray" wanting a "pack of powder," which she said was cocaine. Bessie[1] stated that the victim left

---

[1] Multiple witnesses in this case share common surnames. Therefore, to avoid confusion, we will refer to these witnesses using their given names. We intend no disrespect.

and walked four houses down the road. She explained that the victim would go behind the abandoned house because that was where he kept "his product." She continued,

> So after he got down there, Dray pulled up and he went on back behind the house, whatever he do, and he came back out. And I'd say about a half second – I'd say about three minutes Dray pulled off. He got halfway down the street and heard a gunshot, so I snatched my daughter and we ran in the house. . . .
>
> And I ran back out and I'm like – well, I'm looking. . . . Didn't see [the victim], so I called his phone. No answer.

Defendant Person had been at her home earlier that day, and he asked her about a black jacket at her house.

On cross-examination, Bessie acknowledged that she "shared the same profession" as the victim but that they were friends and not rivals. She could not remember what Defendant Person was wearing that morning. When she heard the gunshots, three other men also were standing in her yard with her.

Wendolyn Beal testified that on the day the victim was killed she was living with Bessie. She recalled that Defendant Person had been at their house earlier in the day. Later, after hearing the gunshot, Wendolyn went behind the vacant house and observed the victim "laying flat on his back" and "[i]n a pool of blood." As she ran away, she saw an undercover police officer and flagged him down.

On cross-examination, Wendolyn stated that it was dark enough behind the vacant house that she "couldn't see [her] hand." She observed Defendant Person at some point that day walking down the street with a black jacket under his arm.

Kimberly Perry, another neighbor of the victim, testified that she also knew the Defendants. On the morning that the victim was killed, she heard Defendant Grandberry say, "I'm going to kill that bitch ass n****r." She observed Defendant Person at the home of her aunt, Bessie, when he retrieved her cousin's "black hoodie." Kimberly left that street at approximately 6:00 to 6:30 p.m. Despite saying so in her statement to police, she did not recall at trial seeing Defendant Person give the "black hoodie" to Defendant Grandberry.

On cross-examination, Kimberly clarified that the reason she did not see an exchange of the "black hoodie" was because she walked away. That afternoon, Defendant Grandberry had asked her to drive him to a location "around the corner" and back. She noted that he was

wearing mostly black with a white shirt on the way there, and, on the way back, "he just had on all black."

Chasity Perry testified that she was Defendant Grandberry's girlfriend on April 25, 2009. At the time, she was living with her grandmother, and Defendant Grandberry came to visit her that evening sometime after 9:00 p.m. Chasity was braiding the hair of an individual named Ray Joyner at the time. She confirmed that when Defendant Grandberry arrived "he was shaking and [said] something to the effect that I fucked up." Initially, Chasity believed that Defendant Grandberry was referring to their relationship, but he was not. She also confirmed that he told her that he had been at the vacant house on Shasta Street and that "a shot rang out." Later, Chasity left with Defendant Grandberry and went to a hotel.

On cross-examination, Chasity clarified that Defendant Grandberry had been living with her and her grandmother for a couple of months prior to the shooting. She acknowledged that police "threatened [her] with a charge of first degree murder" prior to her giving a written statement in this case.

Ray Joyner testified that he was at Chasity's home on April 25, 2009, getting his hair braided. He was sitting on the porch, and, sometime "between nine and ten," Chasity's boyfriend, who he identified as Defendant Grandberry at trial, arrived. Eventually, Chasity asked Joyner to take her and Defendant Grandberry to a hotel, and he complied. Once they reached the hotel, Chasity finished braiding Joyner's hair.

Sergeant James T. Max with the MPD testified that he responded to the scene of the shooting on April 25, 2009. He described the front of the vacant house where the shooting occurred as well-lit but noted that the back was dark. Sergeant Max continued,

> As you go around to the back, on the southwest corner of the house was a small, covered porch area. Concrete steps – two concrete steps leading out to the yard. At the base of that bottom step was [the victim]. He was lying in a face up position, head facing southeast. The feet – actually his right foot was actually on the step. . . . And one of the things I noticed was that []his pants pockets were turned inside out, which is an indicator to me that someone or him [sic] had taken something out in a hurried fashion.

Sergeant Max later learned that this home had belonged to the victim's mother before she passed away and left it to the victim. Eventually, he searched the home and found "[t]wo .40 caliber cartridge casings spent, like four beer cans, a pair of blue jeans, and a vodka bottle." He stated that "most of the furniture in the home was just thrown out in the

backyard, it appeared." Sergeant Max identified a picture of the victim's left hand which had "what appears to be blood" on it. He did not recall seeing "defensive wounds" on the victim such as cuts, scratches, or scrapes. The blood on the victim's hand seemed to be from "a pool of blood that was underneath his head and shoulder when he had – his palms were down."

Sergeant Max identified a picture at trial of the wall where the back porch was located. He explained, "There's a piece of siding, lap siding, missing from the house. And just south of the torn – where the piece of siding is missing, there was what appeared to be a plastic baggie up underneath the piece of siding." Upon further investigation, they found a second plastic bag hidden under the siding. From his experience, plastic bags similar to the bag he described often were used to contain illegal substances.

From observing the victim's face, Sergeant Max noticed a hole or wound to the victim's left chin. Additionally, he observed "a protrusion under the skin" on the back of his neck "one inch below the rear hair line and just to the right of his spine." He further explained, "It was like an entry type wound that did not exit."

On May 2, 2009, Sergeant Max responded to a call at 973 Echols because he was asked "to locate a Mr. Kinner who had possibly been in possession of a firearm that may have been used in this homicide." Kinner showed Sergeant Max and the other officers present where the gun was located under a mattress. Sergeant Max described the weapon as "a Taurus six shot revolver, .38 caliber." The gun was loaded with "five live rounds" when they found it.

On cross-examination, Sergeant Max acknowledged that a .40 caliber bullet cannot be fired from a .38 caliber weapon. He later learned that the plastic bags found under the siding on the house contained eight grams of crack cocaine. The house had been burned in November of 2008.

Officer Stacy Milligan with the MPD testified that he currently worked in the crime scene division. He stated that on April 27, 2009, he collected evidence at the scene, which included "[a] Black and Mild box, a set of keys with the President and his family on them, and two cigars, Black and Mild, [and] one blue cigarette lighter." He identified this evidence at trial but noted that the keys were no longer present with the rest of the evidence.

On cross-examination, Officer Milligan agreed that he was familiar with Shasta as being an area with a lot of drug activity. He acknowledged that fingerprints were not taken from these items. He confirmed that he arrived on the scene after being called at 8:30 a.m. and submitted the evidence into the property room at 10:26 a.m.

Margaret Williams, the victim's great-aunt, identified a picture of the victim at trial. She stated that her family had received the keys discussed by Officer Milligan because the victim's grandmother needed the keys to move the victim's car. She recalled that it was "quite a few days" before they received the keys.

Officer Demar Wells testified that his current assignment with the MPD was in Crime Scene Investigation. He responded to the crime scene in this case on April 25, 2009. He identified two Winchester spent .40 caliber shell casings which he collected at the scene. On cross-examination, he agreed that a .40 caliber bullet could not be fired through a .38 caliber weapon because a .40 caliber bullet would be too large. In his written description of the victim, he noted,

> Vic[tim] was wearing a white and black t-shirt, a white tank top t-shirt, black with grey band Fruit of Loom underwear, white tube socks, black cloth boots, blue jeans, with a white leather belt.
>
> The white leather belt had a silver-colored skull with blue eyes for a belt buckle. A silver-colored chain was attached to one of the belt loops on the right side of the blue jeans vic[tim] was wearing. A black cell phone inside of a black cell phone case was also on the right side of victim's blue jeans.

Officer Wells confirmed that he provided the cell phone to the homicide division "for investigative purposes."

Lieutenant Walter Davidson with the MPD testified that in April 2009 he was assigned to the homicide division and was involved in the present case. He and Sergeant Ragland interviewed Defendant Grandberry on April 26, 2009. Lieutenant Davidson identified the advice of rights form through which Defendant Grandberry waived his rights. From this interview, Defendant Grandberry told Lieutenant Davidson, "[H]e left the – what he called the track on Shasta around 8:30, went to his girlfriend's house – I believe her name was Chastity or Chasity . . . and spent the evening with her." Lieutenant Davidson then attempted to contact Defendant Grandberry's girlfriend and was unable to do so, but he was able to speak with some other individuals at her house. He stated, "[W]e talked to Chasity's grandmother I believe, and she couldn't verify what he said, as well as one of Chasity's sisters said he wasn't there." While they followed up on this information, they released Defendant Grandberry. Lieutenant Davidson stated that Defendant Person consented to giving DNA samples.

Special Agent Jessica Linn Marquez with the Tennessee Bureau of Investigation ("TBI") Memphis Crime Laboratory testified as an expert in Serology and DNA analysis.

-7-

She analyzed a number of DNA samples in this case. She agreed that she had "known sample[s]" from the victim, the Defendants, and Chasity. She first stated that her analysis of four beer cans, blue jeans, and a vodka bottle revealed DNA of a male not matching any of the known individuals. Later, she received some black jeans and a black t-shirt belonging to Defendant Grandberry, which she tested for the presence of blood. On the black jeans, she found DNA matching that of Defendant Grandberry. The black t-shirt did not indicate the presence of blood. She did not find the presence of DNA matching the victim on either item.

Sergeant Anthony Mullins with the MPD testified that he had worked in the homicide division for the past eight years. As part of his investigation in this case, he and Sergeant Mason interviewed Defendant Person on May 1, 2009. He identified the advice of rights form signed by Defendant Person, waiving his rights. From this interview, Sergeant Mullins learned the following from Defendant Person about the day of the shooting:

> He said he was on Shasta Street at some point during the afternoon off and on, different house back and forth talking to different people. Spent some time at Bessie's house. There was a house next door that people hung around at, but basically he spent his time right there on Shasta Street.

Defendant Person told Sergeant Mullins he had known the victim for approximately twelve to thirteen years. Sergeant Mullins continued, "[Defendant Person] said people call him [Defendant Person] the Lulu Man and we had to ask him what that meant. He said he would sell fake dope, fake specifically crack cocaine, soap, anything white that they could cut into small pieces and pass off as crack cocaine. He would sell that to addicts and they would call that lulus."

Defendant Person told Sergeant Mullins that he went inside Bessie's home to get a black hooded sweatshirt from the house. Defendant Person "said that as he was walking out [Bessie] asked him why he had her son's hoodie and he basically told her to mind her own business and just kept on walking." From there, Defendant Person walked to the vacant house located two houses down the street. Sometime later, Defendant Person walked to the B52 Market, approximately one-quarter-mile away, to buy some beer. After going to the market, he returned to Bessie's home. Bessie's boyfriend asked Defendant Person whether he heard the gunshot, and Defendant Person said that he did. He told Sergeant Mullins that he had seen the victim walk behind the vacant house, "which was typical for [the victim] according to everyone we had talk[ed] to. And he made the comment he was probably just doing this [sic] thing." Upon going to look for the victim after hearing the gunshot, Defendant Person "said he walked over toward the house and looked over a fence with someone named Terry and he saw a body back there behind the house."

At some point, Sergeant Mullins told Defendant Person that Defendant Person was not being truthful, and, eventually, Defendant Person admitted that he had not told the truth regarding his version of the events. Defendant Person then admitted that he was present when the victim was shot. He told the officers that he was in the front of the vacant house when the shooting occurred and that the victim was shot in the backyard. Although Defendant Person did not see the victim get shot, he stated that he heard only one gunshot and that the weapon used was a .38 revolver. He explained that he was in the house "to see where [the victim] hid his dope and to take his dope and take his money. Rob him of his dope and money." Defendant Person had been waiting in the house for the victim for approximately forty-five minutes to an hour. He told the officers that he had no problems with the victim. When Defendant Person heard the gunshot, he ran out through the back of the house, observed the victim lying in the yard, took some money, and fled the scene. He admitted to talking about "robbing" the victim on several occasions prior to the incident.

Sergeant Mullins testified that Defendant Person gave a second statement on June 1, 2009, with his attorney at that time present. In this statement, Defendant Person "just wanted to let us know that he was just there to rob [the victim] and he wanted to rob him of his drugs and money." Defendant Person told Sergeant Mullins that, from this robbery of the victim, he received two hundred dollars.

On cross-examination, Sergeant Mullins acknowledged that it was unusual that Sergeant Mason, who also was present at the May 1, 2009 interview, did not sign the advice of rights form. He maintained, however, that she was present the entire time. Sergeant Mullins estimated that this interview lasted approximately five to eight hours. He confirmed that there was no typed statement from this interview.

Sergeant Mullins described the vacant house as being "fairly close" to the other houses on either side of it. He could not remember whether the backyard of the house was enclosed. He recalled that Defendant Person described himself on the day of the incident as "wearing blue jeans, had a red shirt with some kind of white in it."

Lieutenant Caroline Mason[2] with the MPD testified that she was assigned to the homicide division and was the case coordinator for the investigation into the death of the victim on April 25, 2009. After she arrived at the scene on the evening of the incident, she met with a few female witnesses. She learned the next day that Defendant Grandberry had given a statement that he was with his girlfriend, Chasity, when the victim was killed. Lieutenant Mason then met with Chasity, who told her that she "did see [Defendant Grandberry] the night . . . that the incident occurred later after it occurred, and he had shared

_____

[2] This witness is who Sergeant Mullins refers to as "Sergeant Mason."

with her some of the things that happened on the scene, his involvement." Lieutenant Mason stated that, initially, Chasity was not entirely truthful but that she eventually was forthcoming. Chasity told her that Defendant Grandberry "sold fake drugs on the street."

Lieutenant Mason identified an advice of rights form signed by Defendant Grandberry on April 29, 2009, during an interview for which she was present. During the course of this interview, Defendant Grandberry admitted to being present when the victim was killed. He told Lieutenant Mason that the victim walked from the front of the house, along the left side, to the back of the house. Defendant Grandberry also informed her that a .38 revolver was used in the shooting. Additionally, some cash was taken from the victim, and the victim's pockets were turned inside out. The victim's keys, wallet, and cigarette lighter initially were taken but were "thrown down after the incident." Defendant Grandberry admitted to his involvement in planning the robbery of the victim. He also "was concerned about wearing a mask and being identified."

Lieutenant Mason also identified an advice of rights form signed by Defendant Person on May 1, 2009, and confirmed that she was present for this interview, even though she did not sign the form. Defendant Person told her that his nickname was "Lulu Man" because "[h]e was known for selling fake drugs." Shortly after this interview, Defendant Person was charged in this case. Lieutenant Mason identified a document dated May 3, 2009, indicating the release of the victim's vehicle and keys to the victim's family members.

On cross-examination, Lieutenant Mason acknowledged that the first time Defendant Grandberry met with police he did so voluntarily. She was not present for this first interview but was present for the second interview. She identified her supplement from this interview in which she wrote detailed notes about what transpired. During this interview, Defendant Grandberry explained that the reason he was present when the victim was shot was because he was there to buy some powder cocaine. He also denied receiving any money as a result of the robbery.

When Lieutenant Mason arrived at the scene, a patrol officer already had contained the scene with crime tape. She confirmed that, even as the case coordinator, if someone from crime scene investigation collects evidence and submits it to the property room, that evidence is out of her hands. She could not recall why the keys found were not placed into evidence with the other items found, except that she released the keys with the victim's vehicle.

Out of everyone she interviewed, she believed it was Defendant Person who had known the victim the longest, approximately twelve to thirteen years.

Dr. Karen Chancellor, Chief Medical Examiner for Shelby County, testified as an expert in forensic pathology. She identified her autopsy report of the victim in this case. From her report, she explained that the victim's upper clothes were blood-stained. She found a gunshot wound on the left side of the victim's chin and ultimately discovered the bullet in the back of his neck. She continued,

When it went through the body, it fractured the mandible, the jawbone, it went through the tongue, toward the tongue, and went through the upper part of the pharynx, which is our swallowing mechanism, then it went through the cervical spine at the level of the third cervical body, and then it lodged in the back of the neck.

When this bullet went through the spine, bone fragments went to the spinal column, in the canal, and resulted in damage to the spinal cord and part of the brain. I determined that this was the cause of death. The gunshot wound to the face that went through the neck.

She explained that, after the victim was shot, "[h]e most likely would not have had any voluntary movements and purposeful movements." Accordingly, it was unlikely that he could have taken any steps after getting shot. She identified a photograph of the bullet she retrieved from the victim's neck. Dr. Chancellor discovered, through her toxicology analysis, that the victim had a blood alcohol level of approximately .02. She also found the "active" and "breakdown product" of marijuana in the victim's bloodstream. Her ultimate conclusion was that "[t]his death resulted from a gunshot wound to the chin . . . that damaged the spinal cord. The manner of death was homicide."

On cross-examination, Dr. Chancellor confirmed that bags were taped around the victim's hands when she received the body. She explained that this practice is common in such cases in order to preserve any evidence on the hands. She collected swabs of the hands and nail clippings, but she did not perform the testing on this evidence. Rather, Sergeant Ragland with the MPD retrieved this evidence from her.

She recalled that she removed the following items from the victim's body: "two shirts, . . . . blue jeans, a belt with a metal buckle, black boxer underwear, two white socks, and two black laced boots. And there was a white metal stud earring with a clear stone in each ear." She did not recall seeing a cell phone but acknowledged seeing a cell phone case with the body. She explained that the bullet went from the left side to the right side of the victim's body. She was unable to determine the distance of the gun from the victim's body at the time the gun discharged. Because she did not discover "sooty residues," she did not believe the gun was "within a few inches" of the victim's face.

Sergeant William D. Merritt with the MPD testified that he and Sergeant Ragland were assigned to retrieve the bullet from the medical examiner's office.

Taurus Whitmore testified that on April 27, 2009, Defendant Grandberry informed Whitmore that he had a pistol for sale. The two of them went over to the house of another individual, Demarcus Kinner, to sell the weapon. He described the pistol as a black ".357." He identified his previous testimony in which he also stated that the gun was a "Smith and Wesson." Once they reached Kinner's driveway, Kinner purchased the gun for approximately forty to fifty dollars, and then Whitmore and Defendant Grandberry drove away. After selling the gun, Defendant Grandberry told Whitmore that "[h]e made a mistake. He killed someone and he messed up." He also told Whitmore that he robbed the individual and, as a result, received $700.

On cross-examination, Whitmore did not recall telling detectives that the gun was a "chrome 9 millimeter." He denied that anyone else was with Defendant Grandberry when they went to sell the gun. He did not remember previously testifying that another individual was with Defendant Grandberry. He recalled that Defendant Grandberry told him that he shot the victim.

Demarcus Kinner testified that, in early May 2009, he received a call from Whitmore about a gun for sale. When Whitmore and Defendant Grandberry arrived, Kinner met them at their vehicle because he did not want to make the transaction in the house, where his wife was. While they were making the sale, Kinner asked Defendant Grandberry, "[I]s this dirty," meaning "if any bodies [were] on it," but Defendant Grandberry told him "Nope." Kinner explained that he bought this gun as "family protection" because he and his wife had recently moved to a new neighborhood.

Eventually, police officers came to his house and asked him whether he had "bought anything," which he denied several times until finally admitting that he had bought a gun. They requested the gun, and Kinner complied. He described the gun as a .38 and said that it did not have any bullets in it when he purchased it.

Officer Ruth Horne with the MPD testified that she was a crime scene officer in April 2009. On May 2, 2009, she responded to 973 Echols to take photographs and collect evidence. She collected a .38 revolver from under a mattress of a bedroom in that residence. Officer Horne confirmed that five bullets were in the chamber at the time that they found the gun. Accordingly, they removed the bullets and turned both the gun and bullets in to the property room.

Special Agent Cervinia Braswell with the Tennessee Bureau of Investigation ("TBI") Firearms Identification Unit testified as a firearms identification expert. She explained that, when a semiautomatic pistol is fired, a cartridge automatically ejects from the gun. However, when a revolver is fired, the cartridge stays inside the gun until manually removed. Therefore, cartridge cases from a revolver may not be found at the scene of a crime.

Special Agent Braswell confirmed that she inspected a revolver and bullet fragment related to this case. She described the gun as a Taurus .38 Special revolver that holds six cartridges. As part of her testing, she fired the revolver and compared the fired bullet to the bullet fragment removed from the victim's body and determined that the bullets were fired from the same revolver. In her opinion, the bullet used to kill the victim was fired through the revolver she inspected.

At the conclusion of the State's proof, the defense for both Defendants moved for judgments of acquittal, and the trial court denied both motions. Defendant Grandberry chose not to testify, but his counsel called three witnesses on his behalf.

Gabriel King, Defendant Grandberry's father, testified that he was a close friend of the victim in this case. He was not aware of any animosity between the victim and Defendant Grandberry. On the day the victim was killed, King had been incarcerated for five years. Therefore, he did not know exactly what happened on that day. On cross-examination, King acknowledged that he and the victim both sold drugs.

Kenneth Swift testified that, prior to his incarceration, he lived with his girlfriend, Bessie. He remembered seeing Defendant Grandberry on the morning of April 25, 2009. Swift stated that he stayed on the front porch most of the day. He believed that he would have heard any conversation taking place in the front yard. At no point did he remember Defendant Grandberry talk about robbing the victim.

Swift stated that, after the incident, officers questioned him for approximately five hours, and he never changed his story that he had not heard Defendant Grandberry discuss robbing the victim.

On cross-examination, Swift stated that he did not see Defendant Person on the day of the incident until approximately 10:30 that evening. That was around the time that they heard a gunshot, but Defendant Person was not there at the exact time they heard the gunshot. He denied telling the officers that he theorized the Defendants "had plotted up to do something" to the victim. He agreed that he saw Defendant Person come into his yard approximately one hour after hearing the gunshot.

-13-

Swift identified his signature on a statement typed by police officers on April 28, 2009. He denied, however, telling the officers what he allegedly said in the statement. He admitted that he had sold drugs in that area as well.

Delores Grandberry, Defendant Grandberry's grandmother, testified that she treated the victim like her own son. At the time of the victim's death, Delores had a home on Shasta that she was remodeling. Her main residence was elsewhere during the remodel, but she spent a lot of time at her home on Shasta. She never was aware of any animosity between the victim and Defendant Grandberry.

Following Delores' testimony, the defense for Defendant Grandberry rested, and the defense for Defendant Person began. Defendant Person testified that he turned himself in to police on April 27, 2009. He denied killing someone during the course of a robbery. He stated that he turned himself in because his sister had informed him that police were looking for him.

When he first began speaking with police officers, he denied any involvement in the murder of the victim because he had promised Defendant Grandberry that he would not say anything to police. He acknowledged reading and signing an advice of rights form, waiving those rights.

On May 1, 2009, he was arrested at a shopping mall and again brought in for questioning. At that time, Defendant Person decided to tell police of his involvement. He denied having any involvement in killing the victim. His intention was to steal the victim's "stash" after the victim left the house.

On the day of the killing, he arrived at Bessie's house at approximately 5:30 p.m. Several individuals were present, including Defendant Grandberry, the victim, and Swift. Defendant Person had known the victim for approximately thirteen to fifteen years, and, in that time, the victim always had sold drugs. He also stated that others called him (Defendant Person) the "Lulu Man" because he sold "bad drugs."

On the evening of the shooting, the victim left the area about the time that it got dark. Defendant Grandberry approached Defendant Person and asked Defendant Person for a disguise to steal the victim's drugs from his house while he was gone. Defendant Person retrieved a jacket from Bessie's house for Defendant Grandberry and said that he would accompany Defendant Grandberry.

The Defendants went in the victim's house to look for his "stash" but could not find it. At some point, approximately thirty minutes later, they looked out the front window of

the house and observed the victim "dealing with somebody on the street." The victim then walked to the back of the house. Soon thereafter, Defendant Grandberry walked out the front door. Defendant Person stayed inside and heard a gunshot. He was nervous because he did not know who had fired a gun, and he was not aware that Defendant Grandberry had a gun at the time. Eventually, Defendant Person walked out the back door and observed Defendant Grandberry "standing over [the victim] crying, saying man I think I done killed him. . . . He said yeah I think I messed up. I done killed him, man."

Defendant Grandberry asked Defendant Person not to tell anyone, and Defendant Person agreed. As they fled the scene, Defendant Grandberry handed Defendant Person $200 obtained from the victim's person. Defendant Person denied discussing this robbery earlier in the day. Instead, he insisted that this incident was not planned. On cross-examination, however, he identified his statement to police that the Defendants had discussed robbing the victim on several different occasions prior to the day of the incident.

On cross-examination by Defendant Grandberry's counsel, Defendant Person agreed that Bessie's son was approximately 5'6" tall and that Defendant Grandberry was approximately 6'2" tall. He acknowledged that he was the only person who identified Defendant Grandberry as being in the victim's house that evening. He denied ever in his life having a gun.

The defense for Defendant Person rested, and the State called rebuttal proof. Christy Lane, employed through Shelby County, testified that Defendant Person pleaded guilty to aggravated robbery in 2004, which included the use of a handgun.

Following the conclusion of the proof, the jury deliberated and found the Defendants guilty of first degree murder in the perpetration of a robbery. The trial court sentenced the Defendants to life imprisonment.

The Defendants filed motions for new trial, which the trial court subsequently denied. Defendant Person now appeals, arguing that the trial court erred in: excluding evidence of Defendant Grandberry's involvement in a separate robbery on the day the victim in this case was killed; admitting Defendant Person's statement to police; including the natural and probable consequences rule in its jury instruction on felony murder; and denying Defendant Person's request to provide a special jury instruction on the requisite mens rea necessary for criminal responsibility. He also challenges the sufficiency of the evidence supporting his conviction.

Defendant Grandberry also appeals, challenging the sufficiency of the evidence supporting his conviction and asserting that the trial court erred in not severing the Defendants.

## Analysis

### *Severance of the Defendants*

We first examine Defendant Grandberry's contention that the trial court failed to exercise an independent duty to sever the co-defendants "after it became apparent that [Defendant] Grandberry was clearly prejudiced by [Defendant] Person's testimony." The State, in response, asserts that Defendant Grandberry actually opposed severance prior to trial and, therefore, has waived this issue on appeal.

We review a trial court's decision to grant or deny a motion for severance under an abuse of discretion standard. State v. Dotson, 254 S.W.3d 378, 390 (Tenn. 2008). To determine an abuse of discretion by the trial court, "[t]he record must demonstrate that 'the defendant was clearly prejudiced to the point that the trial court's discretion ended and the granting of [a] severance became a judicial duty,' before an accused is entitled to a reversal of his conviction." State v. Shirley, 6 S.W.3d 243, 246-47 (Tenn. 1999) (quoting State v. Burton, 751 S.W.2d 440, 447 (Tenn. Crim. App. 1988)).

According to Tennessee Rule of Criminal Procedure 8(c), two or more defendants may be joined in the same indictment "if each of the defendants is charged with accountability for each offense included." However, Tennessee Rule of Criminal Procedure 14(1)(A) provides the procedure for severance as follows: "A defendant's motion for severance of offenses or defendants shall be made before trial, except that a motion for severance may be made before or at the close of all evidence if based on a ground not previously known. A defendant waives severance if the motion is not timely."

Immediately prior to trial, the State requested that the trial court consider severing the Defendants. Defendant Grandberry's counsel responded that he had filed a Motion in Limine specifically in opposition to such severance. The State then told the court, "Okay then. We can go – we'll do what we have to do with the officers, Judge, and we're going to go forward based on the fact that they are waiving the issues with the severance." Accordingly, the Defendants proceeded in a joint trial. The first time that Defendant Grandberry raised the issue of severance was in his motion for new trial. Thus, we find that his complaint is untimely and, therefore, waived. See Tenn. R. Crim. P. 14(1)(A).

-16-

*Evidence of Contemporaneous Robbery*

Defendant Person asserts that the trial court erred in not allowing Defendant Person to introduce evidence of Defendant Grandberry's involvement in a "contemporaneous" robbery in order to show Defendant Person's lack of shared intent in the robbery underlying his felony murder conviction.

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. See State v. Banks, 271 S.W.3d 90, 116 (Tenn. 2008). "Reviewing courts will find an abuse of discretion only when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party." Id. (citing Konvalinka v. Chattanooga-Hamilton County Hosp. Auth., 249 S.W.3d 346, 358 (Tenn. 2008)).

Generally, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). However, such evidence may be admissible "for other purposes." Id. "Tennessee courts, as well as a large number of state and federal courts, have allowed the admission of evidence of subsequent crimes, wrongs, or acts when they bear on the issues of identity, intent, continuing scheme or plan, or rebuttal of accident, mistake, or entrapment." State v. Elkins, 102 S.W.3d 578, 583 (Tenn. 2003) (citing State v. Elendt, 654 S.W.2d 411, 413-14 (Tenn. Crim. App. 1983)) (other citations omitted). Thus, such evidence may be used "if its probative value as evidence of the matter at issue is not outweighed by its prejudicial effect upon the defendant." Id. (citing Bunch v. State, 605 S.W.2d 227, 229 (Tenn. 1980)).

At trial, Defendant Person presented an offer of proof outside the presence of the jury of a robbery that occurred on the same day the victim was killed. According to the proof presented, Defendant Grandberry was involved in this robbery at a carwash, which occurred approximately "six minutes" after the victim had left the carwash. The trial court, after hearing the defense's proof, stated,

> [F]or me to allow you to put on proof that [Defendant] Grandberry committed another robbery, I think it's highly prejudicial to [Defendant] Grandberry. I don't find that there is any material issue in the trial of the death of [the victim] that would allow me to put that on. In fact, I find that it would be extremely prejudicial to [Defendant] Grandberry and I . . . don't think that there's any probative value that I can find based on what you've explained to me as to [Defendant] Person.

Accordingly, the trial court determined that the proof was not relevant and did not allow its admission.

We agree with the trial court. The prejudice to Defendant Grandberry in presenting evidence of another robbery taking place on the same day would have been great. Additionally, Defendant Grandberry's participation in another robbery does not negate the intent of Defendant Person to rob the victim in this case. Furthermore, according to the proffered evidence, Defendant Grandberry was accompanied by another individual at the carwash. The proffered evidence was not relevant to show Defendant Person's lack of intent to rob the victim. Moreover, even if the evidence had some relevance, the prejudice to Defendant Grandberry greatly outweighed any probative value of the evidence to Defendant Person. Accordingly, the trial court did not abuse its discretion. Defendant Person is entitled to no relief on this issue.

*Introduction of Defendant Person's Statement*

Defendant Person next argues that the trial court erred in allowing the State to introduce evidence of a statement given by Defendant Person "during the course of negotiations."

Once again, we review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. See Banks, 271 S.W.3d at 116. "Reviewing courts will find an abuse of discretion only when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party." Id. (citing Konvalinka, 249 S.W.3d at 358).

Tennessee Rule of Evidence 410 states,

Except as otherwise provided in this rule, evidence of the following is not, in any civil or criminal proceeding, admissible against the party who made the plea or was a participant in the plea discussions:

(1) A plea of guilty which was later withdrawn;

(2) A plea of nolo contendere;

(3) Any statement made in the course of any proceedings under Rule 11 of the Tennessee Rules of Criminal Procedure regarding either of the foregoing pleas; or

-18-

(4) Any statement made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty or which result in a plea of guilty later withdrawn. Such a statement is admissible, however, in a criminal proceeding for perjury or false statement if the statement was made by the defendant under oath, on the record, and in the presence of counsel.

We note, specifically,

Rule 410's exclusion of statements during plea negotiations applies only to statements to 'an attorney for the prosecuting authority.' On its face, the rule does not bar statements to other people, such as law enforcement officers. However, if the prosecuting attorney utilizes others as the prosecutor's representative during plea negotiations, Rule 410 would extend its exclusionary rule to statements made to these people.

Neil P. Cohen, et al., Tennessee Law of Evidence § 4.10[6][b] (6th ed. 2011) (Internal footnote omitted). Put another way, "when a law enforcement officer acts under the express authorization of the prosecuting attorney, statements made by a defendant to the officer are to be viewed as if they had been made directly to a prosecuting attorney." State v. Hinton, 42 S.W.3d 113, 123 (Tenn. Crim. App. 2000).

We hold that the trial court did not abuse its discretion in admitting Defendant Person's statement. Defendant Person's statement was given to Officer Mullins, not the State, prior to his indictment. According to the State in its discussion with the trial court prior to trial, the State remembered having knowledge of the meeting and informed Defendant Person's counsel that Defendant Person's truthfulness with the officer might result in Defendant Person's being charged with facilitation. Defendant Person has not produced any evidence that Officer Mullins was acting as an agent for the State or that he had any authority to enter into a plea agreement with Defendant Person. Furthermore, this discussion was prior to Defendant Person's indictment, making it considerably unlikely that the parties were partaking in a plea agreement at this time. Thus, we conclude that the trial court did not err in its decision. Accordingly, Defendant Person is entitled to no relief on this issue.

*Jury Instructions*

Defendant Person argues two issues with respect to the jury instructions provided by the trial court. Generally, the trial court has a duty "to give a complete charge of the law applicable to the facts of the case." State v. Sims, 45 S.W.3d 1, 9 (Tenn. 2001) (quoting State v. Thompson, 519 S.W.2d 789, 792 (Tenn. 1975)). However, we review a trial court's

jury instructions in context of the overall charge and not in isolation. See State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994). A trial court commits reversible error if its charge "fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997). Thus, "[w]hen the entire charge, read as a whole, fully and fairly sets out the applicable law, the trial judge does not err in denying a special instruction requested by a party or in denying an inaccurate instruction or one inapplicable to the case at hand." Id. (citing State v. Bohanan, 745 S.W.2d 892, 897 (Tenn. Crim. App. 1987)).

Defendant Person's first issue regarding the jury instructions is that the trial court erred in instructing the jury on the natural and probable consequences rule as applicable to felony murder. The State responds that, given that the felony murder statute is broader than the natural and probable consequences instruction, the inclusion of this jury instruction did not in any way prejudice Defendant Person.

Our supreme court has held that "a trial court's failure to charge the natural and probable consequences rule when warranted by the evidence is constitutional error." State v. Richmond, 90 S.W.3d 648, 657 (Tenn. 2002) (citing State v. Howard, 30 S.W.3d 271, 277 n.6 (Tenn. 2000)). Furthermore, "[f]or such error to be harmless, the State has the burden of establishing beyond a reasonable doubt that the error did not affect the outcome of the trial." Id.

We hold that the trial court fairly presented the legal issues in its instructions to the jury. In its instructions to the jury, the trial court stated, "When one enters into a scheme with another to commit a robbery and death ensues, both defendants are responsible for the death regardless of who actually committed the murder and whether the killing was contemplated." This instruction was given after the natural and probable consequences rule ("A defendant who is criminally responsible for an offense may be found guilty not only of that offense, but also for any other offense or offenses committed by another if you find beyond a reasonable doubt that the other offense or offenses committed were natural and probable consequences of the original offense for which the defendant is found criminally responsible, and that the elements of the other offense or offenses that accompanies the original offense have been proven beyond a reasonable doubt.") but immediately before the instructions regarding the elements of first degree felony murder. Thus, we conclude that, when the entire charge is read as a whole, the charge fully and fairly set out the law applicable to this case. See Hodges, 944 S.W.2d at 352. Accordingly, Defendant Person is entitled to no relief on this issue.

Defendant Person also contends that the trial court erred in denying Defendant Person's special request to charge the jury "on the mens rea necessary to convict of felony

murder by way of criminal responsibility." Specifically, Defendant Person had requested that the trial court include the following in its instructions to the jury: "In order for a defendant to be held criminally responsible for the conduct of another in committing first degree murder in the perpetration of robbery, the defendant must have intended that a robbery be committed."

In its charge to the jury, the trial court included the following instruction: "When one enters into a scheme with another to commit a Robbery and death ensues, both defendants are responsible for the death regardless of who actually committed the murder and whether the killing was specifically contemplated." This instruction stems from this Court's holding in Hinton, 42 S.W.3d at 119. In fact, this Court has upheld a trial court's use of an almost identical instruction. See State v. Joe A. Gallaher, No. E2001-01876-CCA-R3-CD, 2003 WL 21463017, at *6 (Tenn. Crim. App. June 25, 2003) ("When one enters into a scheme with another to commit a robbery and death ensues, all the robbers are responsible for the death regardless of who actually committed the murder and whether the killing was specifically contemplated by the other. No culpable mental state is required for a conviction of this offense except the intent to commit Aggravated Robbery.").[3] Furthermore, the trial court provided the following instruction after instructing the jury regarding the elements for robbery:

> The intent to commit Robbery must exist prior to or concurrent with the commission of the act causing the death of the victim. . . .
>
> "Intentionally" means that a person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result.

We hold that because the trial court provided instructions that "as a whole, fully and fairly set[] out the applicable law, . . . [it did] not err in denying a special instruction requested" by Defendant Person. See Hodges, 944 S.W.2d at 352 (citing Bohanan, 745 S.W.2d at 897). Accordingly, we conclude that the trial court did not abuse its discretion in denying the special instruction concerning the mens rea for felony murder. Therefore, Defendant Person also is not entitled to any relief on this issue.

---

[3] Moreover, the Tennessee Criminal Pattern Jury Instruction 7.03 (16th ed.) now includes this instruction in its charge as to felony murder.

Finally, the Defendants challenge the sufficiency of the evidence supporting their convictions for first degree felony murder. Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The appellate court does not weigh the evidence anew. Rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our Supreme Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

The weight and credibility given to the testimony of witnesses, and the reconciliation of conflicts in that testimony, are questions of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Furthermore, it is not the role of this Court to reevaluate the evidence or substitute its own inferences for those drawn by the jury. State v. Winters, 137 S.W.3d 641, 655 (Tenn. Crim. App. 2003) (citations omitted).

First degree felony murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect, rape of a child, aggravated rape of a child or aircraft piracy." Tenn. Code Ann. § 39-13-202(a)(2) (Supp. 2007). Therefore, we first must consider whether the evidence was sufficient for the jury to determine that the Defendant committed one of the underlying felonies required to convict the Defendant of first degree felony murder.

The State's theory of the case was that Defendant Grandberry shot and killed the victim in the commission of a robbery. Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (2006). A person commits theft of property "if, with the intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Id. § 39-14-103 (2006).

We first will consider the sufficiency of the evidence as to Defendant Grandberry. In so doing, we hold that the State presented ample evidence for the jury to conclude that the Defendant, with the intent to rob the victim, deprived the victim of his property after shooting the victim. We note initially that Defendant Person testified that Defendant Grandberry shot the victim and then retrieved approximately $200 from the victim's pocket.

In Tennessee, it is well-established that an accomplice's uncorroborated testimony cannot be the sole basis of a defendant's conviction. State v. Bough, 152 S.W.3d 453, 464 (Tenn. 2004); see also State v. Bane, 57 S.W.3d 411, 419 (Tenn. 2001). Specifically,

> There must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged.

Bough, 152 S.W.3d at 464 (quoting Bane, 57 S.W.3d at 419).

Here, we not only have the accomplice testimony of Defendant Person implicating Defendant Grandberry in the robbery, but we also have the testimony of several other witnesses establishing Defendant Grandberry's intent. LaShawn Blades testified that, approximately a week before the victim died, she heard Defendant Grandberry tell Defendant Person on her porch that "he wanted to kill [the victim]." Defendant Person responded, "[N]o, man. We just going to rob [him]." She remembered that the Defendants had this same discussion seven times over the course of five days. Additionally, Kimberly Perry recalled hearing Defendant Grandberry say on the morning the victim was killed, "I'm going to kill that bitch ass n****r." Moreover, Taurus Whitmore testified that, two days after the shooting, Defendant Grandberry told Whitmore that "[h]e made a mistake. He killed

-23-

someone and he messed up." He also told Whitmore that he robbed the individual and, as a result, received $700.

Thus, the jury had ample evidence, together with the accomplice testimony of Defendant Person, to find that Defendant Grandberry robbed the victim by shooting him and then stealing his money.

We also must determine whether the jury had sufficient evidence to determine that the victim was killed in the commission of the above felony. Testimony established that the victim died as a result of a gunshot wound and that the manner of death was homicide. Additionally, Chasity Perry testified that, on the evening the victim was killed, Defendant Grandberry arrived at her house "shaking and something to effect that I fucked up." She confirmed that he told her that he had been at the vacant house on Shasta Street and that "a shot rang out."

The State clearly presented sufficient evidence to establish that the victim died during the commission of the robbery. Therefore, the evidence is sufficient to support the Defendant Grandberry's first degree felony murder conviction. Accordingly, he is entitled to no relief on this issue.

Second, we must assess the sufficiency of the evidence as to Defendant Person. The State's theory of the case against Defendant Person was that Defendant Person was liable under a theory of criminal responsibility.

A person is criminally responsible for crimes committed by another when, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2) (2006). Our supreme court has explained that "[t]he justification for this theory of criminal liability is that, in addition to the primary criminal actor, aiders and abettors should be held accountable for the criminal harms they intentionally facilitated or helped set in motion." State v. Sherman, 266 S.W.3d 395, 408 (Tenn. 2008). As long as the State can prove that a defendant knowingly, voluntarily, and with common intent joined with the principal offender in the commission of the crime, the State may seek to hold the defendant criminally liable as a principal under the theory of criminal responsibility for the conduct of another. Id.; see also State v. Hatcher, 310 S.W.3d 788, 811 (Tenn. 2010). "The requisite criminal intent may be inferred from the defendant's 'presence, companionship, and conduct before and after the offense.'" State v. Crenshaw, 64 S.W.3d 374, 384 (Tenn. Crim. App. 2001) (quoting State v. McBee, 644 S.W.2d 425, 428-29 (Tenn. Crim. App. 1982)). While a person's mere presence during the commission of a crime is not sufficient to confer criminal liability, it is not necessary that he or she take

-24-

physical part in the crime. Sherman, 266 S.W.3d at 408. Rather, encouragement of the principal actor will suffice. Id. A defendant convicted under a theory of criminal responsibility for the conduct of another is considered a principal offender to the same extent as if he had committed the offense himself. See Hatcher, 310 S.W.3d at 811.

Once again, we have the testimony of LaShawn Blades that, approximately a week before the victim died, she heard Defendant Grandberry tell Defendant Person on her porch that "he wanted to kill [the victim]." Defendant Person responded, "[N]o, man. We just going to rob [him]." She heard the Defendants have this discussion seven times over the course of five days. Additionally, in Defendant Person's statement to Sergeant Mullins, he stated that he was in the front of the vacant house when the shooting occurred and that the victim was shot in the backyard. Although Defendant Person did not see the victim get shot, he stated that he heard the one gunshot. He explained that he was in the house "to see where [the victim] hid his dope and to take his dope and take his money. Rob him of his dope and money."

Viewing these facts with the strongest legitimate view in favor of the State, see Harris, 839 S.W.2d at 75, the jury clearly had adequate evidence before it to find that Defendant Person was criminally responsible for the robbery of the victim that resulted in the victim's death. Thus, the evidence is sufficient to support Defendant Person's first degree felony murder conviction. He is entitled to no relief on this issue.

## CONCLUSION

For the reasons articulated above, we affirm the Defendants' convictions.

_____
JEFFREY S. BIVINS, JUDGE